# United States Court of Appeals

*for the*

# Seventh Circuit

————————

Case No. 25-2790

MATTHEW L. STEWART,

*Plaintiff-Appellant,*

— v. —

NISSAN NORTH AMERICA, INC. and
NISSAN MOTOR ACCEPTANCE CORPORATION,

*Defendants-Appellees.*

————————

ON APPEAL FROM AN ORDER ENTERED IN THE NORTHERN
DISTRICT OF ILLINOIS, EASTERN DIVISION IN
CASE NO. 1:22-CV-04734, JORGE L. ALONSO, DISTRICT COURT JUDGE

## APPELLANT'S BRIEF AND APPENDIX

LISA L. CLAY
LISA L. CLAY ATTORNEY AT LAW, LTD
*Attorney for Plaintiff-Appellant*
2100 Manchester Road, Suite 1603
Wheaton, Illinois 60187
(630) 456-4818
lisa@clayatlaw.com

CP COUNSEL PRESS    (800) 4-APPEAL • (625033)

Save As    Clear Form

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 25-2790_____

Short Caption: Matthew Stewart v. Nissan North America, Incorporated, et al._____

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):
 Matthew Stewart_____

_____

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:
 the undersigned, Lisa L. Clay Attorney at Law, LTD. and Shannon Foley of Foley Lyman Law Group_____

_____

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        N/A_____

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        N/A_____

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

 N/A_____

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

 N/A_____

Attorney's Signature: /s/ Lisa L. Clay_____    Date: January 25, 2026_____

Attorney's Printed Name: Lisa L. Clay_____

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    **Yes** ☑  **No** ☐

Address: 2100 Manchester Road, Suite 1603_____

    Wheaton, IL 60187_____

Phone Number: 630.456.4818_____    Fax Number: _____

E-Mail Address: lisa@clayatlaw.com_____

rev. 12/19 AK

i

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iv

STATEMENT REGARDING ORAL ARGUMENT ...................................................... 1

JURISDICTIONAL STATEMENT ....................................................................... 1

STATEMENT OF THE ISSUE ............................................................................ 1

INTRODUCTION .......................................................................................... 2

STATEMENT OF THE CASE ............................................................................. 3

    I.      Nature of the Proceedings ................................................................ 3

    II.     Statement of Facts ........................................................................ 4

            Stewart's Automotive History ..................................................... 4

            Stewart is Hired by Nissan ......................................................... 4

            The 2020 "Reorganization" ......................................................... 6

            Stewart and Other Older Workers are Notified of Job
            Eliminations ............................................................................ 11

            Stewart's Efforts to Remain Employed ....................................... 12

                  Commercial Sales Manager (P1) ...................................... 12

                  Consumer Credit Manager (P4) ....................................... 13

            Stewart Complains of Age Discrimination .................................. 14

                  Fixed Operations Manager (Iowa) (P5) ............................ 14

                  Planner, Recalls & Campaigns (P6) ................................. 16

                  Senior Planner, Client Journey Technology (P7) ............ 17

                  Commercial Sales Manager (P8) ...................................... 18

                  Senior Fixed Operations Manager with
                  Infiniti (P9) .................................................................... 19

            Stewart and Others Make Complaints of Age
            Discrimination ........................................................................ 19

                  Senior Planner, Campaign Acceleration and
                  Special Projects (P10) ..................................................... 20

Stewart and Six Other Older Workers are Terminated; Stewart's Job Responsibilities are Allocated to Younger Employees ................................................................... 21

Stewart's Position "Reappears" ................................................... 22

SUMMARY OF THE ARGUMENT ............................................................. 22

ARGUMENT ............................................................................................ 23

    I.    Standard of Review ................................................................... 23

    II.    Stewart Presented Sufficient Evidence that He Was Not Hired Because of His Age ..................................................................... 24

    III.    The District Court Erred by Failing to Construe All Facts and Draw All Reasonable Inference in the Light Most favorable to Stewart and by Making Improper Credibility Determinations ........... 26

        A.    Stewart Did Not Receive the Benefit of Reasonable Inferences Regarding the Claimed "Reorganization" ................ 28

        B.    Stewart Did Not Receive the Benefit of Reasonable Inferences Regarding All Ten Positions for Which He Applied – Not Just the Position at Issue ................................... 29

    IV.    The District Court Erred by Failing to Consider the Entire Record ....................................................................................... 32

        A.    Stewart Established Pretext by Raising Questions of Fact and Credibility Regarding the Claimed "Reorganization" ......................................................................... 34

        B.    Stewart Established Pretext by Raising Questions of Fact and Credibility Regarding the Entirety of the Hiring Process ......................................................................... 36

CONCLUSION ........................................................................................... 38

## TABLE OF AUTHORITIES

Page(s)

**Cases:**

*Courtney v. Biosounds, Inc.,*
42 F.3d 414 (7th Cir 1994) ........................................................................28

*Cunningham v. Austin,*
125 F.4th 783 (7th Cir. 2025) ....................................................................33

*Hansen v. Fincantieri Marine Group, LLC.,*
763 F.3d 832 (7th Cir. 2014) .....................................................................27

*Joll v. Valparaiso Cmty. Sch.,*
953 F.3d 923 (7th Cir. 2020)................................................................. 26, 27

*Moore v. County of Cook,*
No. 98-3678, 1999 U.S. App. LEXIS 16918 (7th Cir. July 19, 1999) ............... 27, 28

*Mullin v. Temco Mach., Inc.,*
732 F.3d 772 (7th Cir. 2013).....................................................................23

*Murphy v. Caterpillar, Inc.,*
140 F.4th 900 (7th Cir. 2024) .............................................................. 25, 38

*Ortiz v. Werner Enterprises, Inc.,*
834 F.3d 760 (7th Cir. 2016).............................................................24, 25, 38

*Orton-Bell v. Indiana,*
759 F.3d 768 (7th Cir 2014) .....................................................................27

*Tuttle v. Serv-U-Success,*
No. 10-1426, 2013 U.S. Dist. LEXIS 5514 (C.D. Ill. Sept. 19, 1988).....................27

*Waldridge v. Am. Hoechst Corp.,*
24 F.3d 918 (7th Cir. 1994)......................................................................24

*Wallace v. SMC Pneumatics, Inc.,*
103 F.3d 1394 (7th Cir. 1997)...................................................................28

*Washington v. Haupert,*
481 F.3d 543 (7th Cir. 2007).....................................................................27

*Weed v. Evanston Hosp. Corp.,*
1998 U.S. Dist. LEXIS 19244 (N.D. Ill. Dec. 4, 1998)...........................................28

**Statutes & Other Authorities:**

28 U.S.C. § 1291.......................................................................................1

28 U.S.C. § 1331.......................................................................................1

29 U.S.C. § 621................................................................................................ 1

Fed. R. Civ. P. 56 ...................................................................................... 1, 23

Seventh Circuit Rule 34(f)............................................................................ 1

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to Seventh Circuit Rule 34(f), Appellant respectfully requests oral argument. Appellant believes that this appeal presents important questions about the application of Fed. R. Civ. P. 56 to discrimination cases and believes that oral arguments will benefit the Court.

## JURISDICTIONAL STATEMENT

The Northern District of Illinois had jurisdiction over this action on the basis of federal question jurisdiction (28 U.S.C. § 1331) because Plaintiff/Appellant Matthew Stewart ("Stewart") brought suit under the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et. seq.* The district court granted summary judgment to Defendants Nissan North American ("NNA") and Nissan Motor Acceptance Corporation ("NMAC") (collectively "Nissan") and entered judgment in Nissan's favor on September 19, 2025. No further claims remain pending in the trial court. Stewart filed his Notice of Appeal on October 9, 2025. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUE

Did the district court err by making credibility determinations, failing to make factual inferences in favor of the non-moving party, crediting disputed statements of fact in the moving party's favor or failing to evaluate all record evidence when granting summary judgment on Stewart's age discrimination claim alleging a failure to hire him for a Senior Fixed Operations Manager position.

1

INTRODUCTION

Rules and standards matter. Because entry of summary judgment deprives a plaintiff of the opportunity to present his or her case to a jury, the court must follow the rules and review all available evidence – and *all* means *all*. The court must also apply the applicable standards – no weighing the evidence, no credibility determinations, drawing all speculative inferences in favor of non-movant – with "added rigor" in the summary judgment context. It's not a different standard, but an acknowledgement that employment discrimination cases usually rise or fall on intent and credibility.

This case is a textbook example of why those rules and that added rigor matters, because this case requires a review of all available evidence – even though the claim at issue relates to a single hiring decision – and rises or falls on intent: the intent behind Nissan's claimed "reorganization" that left seven (7) all older workers standing in the unemployment line, but found new Nissan jobs – so called "management directed transfers" – for eight (8) mostly younger (and in many cases less-qualified) workers; the intent behind overlooking Stewart for those transfers despite his 20-year tenure and willingness to relocate to stay with Nissan; the intent behind Nissan corporate documents that identify individuals, not regions for elimination; the intent behind Nissan categorizing positions as "open" but filling nearly all of them with "management directed transfers"; the intent behind Nissan's hiring process that felt designed to prevent Stewart from receiving an offer; and

2

finally, the intent behind Nissan "eliminating" Stewart's role, only to return the role

eight (8) months later, filled by a younger much less qualified employee.

This appeal asks for one thing, and one thing only: a proper application of the

*Ortiz* standard requiring the evaluation of all available evidence with all proper

inferences drawn. Summary judgment cannot be the outcome of that analysis.

## STATEMENT OF THE CASE

I.     *Nature of the Proceedings*

On September 2, 2022, Stewart filed a two-count complaint alleging

discrimination (Count I) and retaliation (Count II) under the ADEA in the Northern

District of Illinois.[1] Stewart's discrimination claims related to (1) Nissan's

elimination of his Financial Services Manager (FSM) position on June 4, 2020 as

part of a claimed "reorganization"; (2) his termination from that FSM role on

August 4, 2020; and (3) Nissan's failure to hire Stewart for any of the ten positions

for which he applied between June and August of 2020. Nissan filed a partial

Motion to Dismiss, to which Plaintiff responded by filing both an oppositional brief

and an Amended Complaint. Defendants did not renew their Motion to Dismiss and

answered the Amended Complaint on December 20, 2022. Nearly two years of

contentious discovery followed before Defendants filed their Motion for Summary

Judgment, a 100-paragraph Rule 56.1 statement and *several thousand* pages of

---

[1] It is undisputed that this filing was timely based on Stewart's EEOC charge and Notice of
Right to Sue (Dkt. No. 3 (Original Complaint)) Plaintiff does not appeal the dismissal of the
majority of his discrimination claims on the timeliness of his underlying EEOC charge (Dkt.
No. 204, (short appendix affixed to this brief and referenced herein by page as "A[1-12]. (A4-
A7). Similarly, citation to the Separate Appendix Volume One (unsealed) and Supplemental
Index Volume Two (sealed) are referenced as "SA[1-53]."

exhibits, on October 4, 2024. The district court granted that motion in its entirety on September 19, 2025. Stewart timely appealed and seeks reversal of only the dismissal of his failure to hire claim regarding the Senior Fixed Operations Position (P5) that was filled by a much less experienced 32-year old external candidate.

II.     *Statement of Facts*

*Stewart's Automotive History*

Stewart has been in the auto industry since he was legally employable. He worked at dealerships in various capacities (technical writer, mechanic, parts and service tech) in high school and college. (Dkt. No. 169 ¶1 *citing* Stewart Decl. (Dkt. No. 150) ¶4). He had his own auto repair business for several years. (*Id.*) Stewart received a Bachelor of Science Degree in Automotive Technology/Engineering where he learned not only the mechanics of cars, but the business side of manufacturing and dealership operations (*Id.* ¶3).

Prior to his employment with Nissan, Stewart worked for both Chevrolet and Kia in a variety of roles that included responsibilities in recalls, reimbursements, parts and service, fixed operations, and dealership management (Stewart Decl. (Dkt. No. 150) ¶¶5-10).

*Stewart is Hired by Nissan*

Stewart's first role was with Nissan's Infiniti division in the role of Technical Specialist; he was responsible for "diagnosing challenging repair cases, training Dealership Parts and Service personnel, and dealing with Aftersales" (Dkt. No. 169 ¶2 *citing* Stewart Decl. (Dkt. No 150) ¶¶13-15).

In 2002, Stewart's boss Dave Walker recommended him for promotion; Stewart received what is referred to at Nissan as a "management directed transfer"[2] to a Distribution, Contests and Incentive Specialist position, a role he had for approximately six (6) months (*Id.* at ¶¶16 – 22).

Stewart received another management directed transfer less than a year later, this time to Financial Services Manager ("FSM") for Infiniti in the Central Region based in Aurora, Illinois (Dkt. No. 149 ¶5; Dkt. No. 169 ¶¶3-5 *citing* Stewart Decl. (Dkt. No. 150) ¶23). Stewart's role included, among other responsibilities, "developing and implementing strategies to assist in reaching district goals and commitments, serving as the primary contact between dealers in his District and NMAC for dealer financing, consumer credit, escalated customer assistance issues and funding resolutions, training new finance mangers, and acquiring new

---

[2] Management directed transfers are important in this case because they provide a candidate a job offer without the need for an application and interview, and they were utilized extensively during the alleged 2020 "reorganization" (*See*, *e.g.* Dkt. No. 149 ¶17 *citing* Dessaw Dep. (Dkt. No. 133) Ex. 6 at Nissan_002710 (Simeon Taskov letter) and Nissan _002713 (Vil Vina letter) and Ex. 10 Nissan_003972 (SA-10) (chart reflecting management offers)); *see also* Dkt. No. 149 ¶40 and Dkt. No. 156 ¶11 *citing* Workday documents relating to the Commercial Sales Manager position (P1) that Stewart applied for (positions for which Stewart applied are referred to as "P1"-"P10") establishing limited length of time position was open, Exhibit U (Dkt. No. 161-6) Nissan_000635-638; 721-722, 1915-1922 at Nissan_001915); Dkt. No. 149 ¶52 and Dkt. No. 156 ¶13 *citing* Workday documents relating to the Consumer Credit Manager position (P4) establishing limited length of time position was open, Exhibit X (Dkt. No. 161-9) Nissan_000554-558 at Nissan_000558); Dkt. No. 149 ¶62 *citing* Yu Dep. (Dkt. No. 141) 29:22-30:1 (Planner Recalls & Campaigns (P6) position only open for 5 days); Dessaw Dep. (Dkt. No. 133) 193:9-16 and Dep. Ex. 12 (SA-1-7) (chosen candidates not listed as a candidate); Dkt. No. 149 ¶71 (stating that chosen candidate had already been offered the Commercial Sales Manager role (P8)); Dkt. No. 149 ¶75 *citing* Dessaw Dep. (Dkt. No. 134) 119:2-17 (testimony acknowledging that the Senior Fixed Operations Manager role (P9) was filled with a management directed transfer). These are all examples of reasonable inferences that positions for which Stewart applied were filled with a management directed transfer and were not truly "open" positions.

commercial credit accounts and completing documentation needed for closing the loans" (Dkt. No. 149 ¶6 *citing* Stewart Dep. (Dkt. No. 126) 29:6-24, 152:1-9, Ex. 3 p. 1). From 2011 until his termination, Stewart's performance was rated "meets" expectations (Dkt. No. 169 ¶9 *citing* Stewart Decl. ¶¶12, 32, 33). In his FSM role, Stewart helped train both younger, less experienced workers Ricardo "Rey" Razo and Simeon Taskov (Stewart Decl. (Dkt. No. 150) ¶¶25-26).

*The 2020 "Reorganization"*

In early 2020, it is undisputed that certain members of NMAC management, namely Director of Sales Operations for NMAC Eric Ledieu, Senior Manager of Sales Operations Mark Lubbers, Regional Financial Services Manager (RFSM) John McBane, RFSM Nick Hungerford and RFSM Jamie Beck held high-level meetings. The purpose of those meetings and the decisions that resulted from those meetings are hotly disputed (Dkt. No. 149 ¶¶9-18). Nissan frames these meetings as a "reorganization" process that resulted from NNA's decision to "eliminate the Northwest Region and the Mountain Region, which resulted in NMAC working to eliminate the Northwest and Mountain Regions as well because NMAC aligns its regional footprint with NNA" (Dkt. No. 149 ¶8).

Nissan claims that a group of Senior and Director-level management determined at some point in early 2020 that "NMAC should create a new inside sales team based in Dallas, Taxes, to serve small dealers on a remote-basis by having those employees all be located in a new Dallas call center known as Signature Direct … while the remaining large dealers would continue to be serviced in-person by FSMs

6

under the newly reorganized regional structure" (Dkt. No. 149 ¶10). Nissan claims that this analysis resulted in the categorization of all dealers as "large" or "small," (Dkt. No. 149 ¶11) and that "the determination of which dealers would be called on by Signature Direct was initially based on sales volume and classifying dealers as 'large and small'" (*Id.*).

Stewart presents these facts very differently, pointing out that Nissan documents in circulation during these meetings clearly indicate that *individuals, not regions*, were the target of "reorganization."

As a preliminary matter, Nissan acknowledges that it uses a yearly "calibration" meeting to evaluate and rank its employees; as Stewart's supervisor AOM Lisa Cicchini testified to participating in yearly calibration along with John McBane, another "reorganization" participant (Dkt. No. 149 ¶81 *citing* Cicchini Dep. (Dkt. No. 132) 33:4-35:24) sometime in January or February of 2020. The document reflecting this process, aptly titled "Facilitate Calibration" (Nissan_002960) (Dkt. No. 149 ¶¶14, 15, 20, 21, 22, 32, 33, 81, 89, 91, 95, *citing* Ledieu 30(b)(6) Dep. Ex. 14 (Dkt. No. 137, pp. 351-353) (SA11-12)[3] is a critical document. Nissan was so desperate to distance itself from the "Facilitate Calibration" document that it claimed – unbelievably – that a document *titled* "Facilitate Calibration" is "neither a calibration document nor a ranking document nor was it used to make any decisions related to the reorganization" (Dkt. No. 149 ¶95). Yet, interestingly, the

---

[3] Citation to Dkt. No. 137, the sealed version of Eric Ledieu's 30(b)(6) Deposition and sealed exhibits, reflect both the bates number (which are not chronological) and the PDF page number (out of a total of 399 pages) because the exhibit as a whole does not contain page numbers.

"Team Impact" slide (Nissan_003353) from Nissan's March "NMAC Org Discussion" PowerPoint (Ledieu 30(b)(6) Dep. Ex. 10 (Dkt. No. 137, p. 266) (SA36) is *verbatim* the same information as Nissan's "Facilitate Calibration" chart (Compare Dkt. No. 137 pp. 266 (SA36) to 352 (SA11)).

Whether calibration took place earlier or later, the January 7, 2020 "M&S Optimization SVP Update" PowerPoint contains slides by region listing all of the FSMs, with individual ratings (A B or C) and (although the column headings are not visible) time in position, reference to their mobility (willingness to move), and "AOM/Mgr potential" (Dkt. No. 149 ¶¶21, 24, 27, and 96, *citing* Ledieu 30(b)(6) Dep. Ex. 7 at Nissan_04240 (Dkt. No. 137 p. 195) (SA20). Stewart is listed as "mobile" (*Id.*). The slide deck also includes regional slides that list individuals and their positions (Ledieu 30(b)(6) Dep Ex. 7 at Nissan_004217 – 4222) (SA14-19).[4]

The February 2020 iteration of these materials (Dkt. No. 149, ¶¶21, 24, 26, 27 and 32, *citing* Ledieu 30(b)(6) Dep. Ex 8, Nissan_002766-2815 (Dkt. No. 137, pp. 204 – 252) matches the earlier January names and rankings (Nissan_002795 (Dkt. No. 137 p. 232) (SA23) to positions (Nissan_002791 (Dkt. No. 137 p. 228) (SA22); the effort to find jobs for the mostly younger employees also begins (compare January materials, Nissan_004217 – 4222 (Dkt. No. 137 pp. 172-177) (SA14-19) to February materials, Nissan_002804 – 2809 (Dkt. No. 137 pp. 241-246) (SA24-29).

---

[4] Nissan ties itself in knots attempting to distance the decision-makers from Ledieu 30(b)(6) Dep. Ex. 9, Nissan_004178 (Dkt. No. 137 pp. 253-257, (SA30-33)), the excel spreadsheet from which the information in one of the January 2020 slides, Nissan_004240 (Dkt. No 137 p. 195 (SA20) appears to have come from. Nissan_004178 refers to Stewart as "difficult to place," a statement no one would own (Dkt. No. 149, ¶96 *citing* Ledieu 30(b)(6) Dep. Ex. 9 Nissan_004178 (Dkt. No. 137 pp. 253-257) (SA30).

The March 2020 PowerPoint titled "NMAC Org Discussion" contains identical region slides (Dkt. No. 149, ¶¶13-15, 19-21, 24-27, 29, 32, 33, 89, 91, 94, 95, 97, 99, *citing* Ledieu 30(b)(6) Dep Ex. 10, Nissan_003366-3371 (Dkt. No. 137, pp. 279-284) (SA39-44)). Nissan disingenuously attempts to claim that data contained in an undated PowerPoint, (Ledieu 30(b)(6) Dep. Ex. 11, Nissan_004432 (Dkt. No. 137, pp. 291-294)), was "created to get approval from Nissan's President for the outlay of money that would result from the reorganization and was not used as part of any other decision" (Dkt. No. 149, ¶97), but that cannot be true. The first tab of Nissan_004432 titled "Scenario" (Dkt. No. 137 p. 291) (SA45) shows an ongoing salary column total of $1,068,000; (the salary cost saved by terminating the older workers); and that amount is carried over to the last tab, a chart titled "Inside Sales Payback 5 years" (Dkt. No. 137 p. 294) (SA46). That chart appears *verbatim* in Nissan's March 2020 Reorganization materials (compare Ledieu 30(b)(6) Dep. Ex. 10, Nissan_003351 (Dkt. No. 137 p. 264) (SA36) with Ledieu 30(b)(6) Dep. Ex. 11, Nissan_004432 (Dkt. No. 137 p. 294) (SA46).

Nissan's region slides do not change between February 2020, when the names identified in January 2020 were matched to positions and July 2020, after the "reorganization" had been announced (Dkt. No. 149, ¶13, *citing* Ledieu 30(b)(6) Dep. Ex. 12, Nissan_004022-4027 (Dkt. No. 137 pp. 337 -342) (SA49-54).

Further, the "large" versus "small" dealer analysis was not applied in the way Nissan claimed it would be (Dkt. No 149, ¶¶11 (*citing* Ledieu 30(b)(6) Dep. (Dkt. No. 137) 60:17-61:10; 208:24-211:2 (confirming Stewart's dealer transfers; *see also* Dep.

Ex. 15 (Dkt. No. 137 pp. 354 – 372). Stewart was in the Midwest Region and had fewer small dealers than younger DSM Ray Razo (age 33), but Stewart's large dealers were transferred to Razo, and Nissan retained younger employee Razo (instead of vice versa, which would have made more sense) (*Id.*); Nissan FSM Greg Leiter, another older displaced FSM who was not given a management directed transfer, only had two small dealers but his large dealers were also transferred to a younger FSM and his position was also eliminated (*Id. citing* Leiter Dep. (Dkt. No. 153) 66:16-67:10; Ledieu 30(b)(6) Dep. (Dkt. No. 137) 61:19 – 62:16; 212:8-213:12). But Simeon Taskov, age 33, a DFSM (Developmental FSM) with a large number of small dealers, was given a management directed transfer to a new Midwest region district (Kansas City/Omaha/Des Moines)[5] (*Id., see also* Dkt. No. 149 ¶22).

The Nissan "reorganization" eliminated 15 positions; eight (mostly younger) employees were offered jobs (so-called "management directed transfers") while the seven older FSM employees (ages 47 – 56) were not transferred to new territories or the Signature Direct positions in Dallas (Dkt. No. 149, ¶19 *citing* Ledieu 30(b)(6) (Dkt. No. 137) Dep. Ex. 2 (letters advising retained employees of management directed transfers) and Dep. Ex. 11 at Nissan_004432 ("Scenario" tab reflecting the 7 older workers and savings associated with the elimination of their respective positions) (SA45).[6]

---

[5] Nissan remains unable to answer the question as to why new districts were being created within a district that Nissan claims was being eliminated.

[6] Eight employees were eventually terminated on August 4, 2020; a younger employee, Matt Stocking, was offered a management directed transfer but declined the role (Dkt. No. 149, ¶86 *citing* Ledieu 30(b)(6) Dep. (Dkt. No. 137) 83:21-84:5).

*Stewart and Other Older Workers are Notified of Job Eliminations*

Stewart was one of the seven older FSM employees who attended a call with members of his management organization in or around June 4, 2020, and was advised "that his current position would be eliminated due to an organizational restructuring" (Dkt. No. 204 A1-A2). During that meeting Stewart "received a letter which provided that his position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020." (*Id.*). The letter provided that Stewart could voluntarily separate at any time without receiving severance pay or stay at the company through August 3 and apply for open positions, receiving severance pay if he did not receive an offer for a comparable position." (*Id.*)

Nissan claims that Stewart was not considered for either of the FSM positions that were created in his district or one of the Signature Direct positions because the decision-makers *believed* Plaintiff was not willing to relocate (not "mobile") (Dkt. No. 149 ¶¶24, 26, 28). But Stewart *was mobile.* (Dkt. No. 149 ¶¶24, 26, 28, *citing, e.g.* Ledieu 30(b)(6) Dep. Ex. 7, Nissan_004240 (Dkt. No 137 p. 195( (SA20) (January PowerPoint slide reflecting "Y - Now" regarding mobility); Ledieu 30(b)(6) Dep. Ex. 8 Nissan_002795 (Dkt. No. 137 p. 232(SA23) (February PowerPoint slide reflecting "Y – Now" regarding mobility); Ex. 9, Nissan_004178 (Dkt. No. 137 pp. 254) (SA30) (underlying excel spreadsheet reflecting "Y – Now" regarding mobility); Stewart's testimony (Stewart Dep. (Dkt. No. 126) 52:3-14; Stewart Decl. (Dkt. No. 150) ¶¶31, 34, 38, 39); his application to ten jobs, most requiring relocation (Dkt.

11

No. 149 ¶¶37-80); and his record Workday personnel profile (Dessaw Dep. (Dkt. No. 133) 247:7-18, Ex. 17 at PL-MS00049 (Page 12 of 30)).

*Stewart's Efforts to Remain Employed*

Stewart applied to ten open positions at Nissan between June 17 and July 16, 2020. (Dkt. No. 149 ¶¶37-80 *citing* Stewart Decl. (Dkt, No, 150) ¶¶45, 48-57).

Commercial Sales Manager (P1) [7]

Stewart applied for the position of Commercial Sales Manager. There are a number of oddities regarding this Commercial Sales Manager job opening and how it was filled. Nissan makes a point of claiming that "the hiring managers were unaware of Plaintiff's alleged complaints of age discrimination" (Dkt. No. 149 ¶81) – a disputed material fact in itself – yet Nissan is strangely silent as to whether hiring managers had access to age information. Nissan first produced "view application materials" that contained gender, disability status, age and primary nationality information, but later produced a different version that did not contain that information (Dkt. No.149 ¶37) *citing* Stewart Dep. (Dkt. No. 126) Ex. 26 (Nissan_00963-970) for comparison to Exhibit AA (Dkt. No. 161-12) Nissan_001839-45) (noting that Ex. 26 contains a "duplicates" section while Exhibit AA does not; Ex. 26 contains a "personal information" section while Ex. AA does not). Nissan's summary judgment record facts do not address this issue.[8]

---

[7] The parties and the Court refer to the ten open positions by number, P1-P10, throughout the record and Stewart adopts that usage here.

[8] Instead, Defendant's reply claims, *without citation to any record evidence*, that "[t]he material and undisputed evidence shows that the decisionmakers were not aware of Plaintiff's age…" (Dkt. No. 168, p. 2).

Nissan then misrepresents the experience and residence of the younger employee who was offered the role: Sanchez does not appear as a candidate in Nissan hiring documents (Dessaw Dep. Ex. 12 (Dkt. No. 133) at Nissan_001925) (SA4), a circumstances Nissan's 30(b)(6) designee could not explain[9] and Sanchez was offered the job – a demotion for Sanchez – only eight (8) days after posting, likely a "management directed transfer" (Dkt. No. 149 ¶39 and Dkt. No. 156 ¶11 *citing* Workday documents relating to the Commercial Sales Manager position (P1) establishing limited length of time position was open, Exhibit U (Dkt. No. 161-6) Nissan_000635-638; 721-722, 1915-1922 at Nissan_001915). Stewart was mobile, would have moved for a job opportunity, and had the largest Commercial Sales Account in the country (Stewart Decl. (Dkt. No. 150) ¶¶ 24, 54). Stewart had over 25 years of auto experience, nearly 20 years working with Nissan, but he did not even receive an interview for this role (*Id.*).

<u>Consumer Credit Manager (P4)</u>

Stewart applied for the Consumer Credit Manager position. Similarly, documents and testimony relating to the Consumer Credit Manager position (P4) point to a management directed transfer: the requisition for the position was posted on June 9, 2020, and removed on June 18 (the day after Plaintiff applied); the person chosen does not appear on the candidate list (Dkt. No. 149 ¶ 52 citing

---

[9] Camille Dessaw, Nissan's 30(b)(6) designee on the topic of recruiting, disclaimed knowledge of all things recruiting more or less wholesale (Dessaw 30(b)(6) Dep. (Dkt. No. 134) 85:2 – 18). This same document anomaly was also at issue with positions 3-8.

13

Dessaw Dep. (Dkt. No. 133) Ex. 12 at Nissan_002296) (SA3) and there are no interview records (Dkt. No. 149 ¶52 and Dkt. No. 156 ¶13 *citing* Exhibit X (Dkt. No. 161-9) Consumer Credit Manager Workday documents: Nissan_000554-558 at Nissan_000558).

### Stewart Complains of Age Discrimination

In June or July 2020, Stewart advised his boss, Area Operations Manager Lisa Cicchini, that he believed he had been chosen for termination because of his age (Dkt. No. 149 ¶82 *citing* Cicchini Dep. (Dkt. No. 118) 23:4-9; Stewart Decl. (Dkt. No. 150) ¶159). Cicchini *did not* report the age discrimination complaint and Nissan did not investigate the complaint. (*Id. citing* Cicchini Dep. (Dkt. No. 118) 19:6-20).

### Fixed Operations Manager (Iowa) (P5)

Stewart applied for the Fixed Operations Manager (Iowa) position.[10]  Stewart applied for the position on July 16, 2020 (Dkt. No. 149 ¶54), and Nissan's decision to hire external substantially younger candidate Erik Anderberg (age 32) instead of Stewart, a twenty-year veteran risking termination, is the hiring decision at issue in this appeal.

July 16, 2020 was only a few weeks before Stewart's August 4, 2020 deadline to find a new role. Stewart applied for two positions that day (Dkt. No. 149 ¶54 *citing* Stewart Dep. (Dkt. No. 126) 125:13-24); ¶60 *citing* Stewart Dep. (Dkt. No. 126)

---

[10] The remaining jobs are not at issue in this appeal, either because the District Court found those decisions not actionable because Nissan hired an older worker or because the District Court held that Stewart had not timely filed his EEOC charge related to those hiring decisions. Stewart is not appealing those holdings, nor is he appealing the dismissal of his position elimination and termination claims, which were also dismissed based on the timing of his EEOC charge. Nor does Stewart appeal the dismissal of his retaliation claim.

137:17-18:1). Scott Harrison was the hiring manager for the Iowa role; his boss, Greg Ebbs, had advised Harrison that Stewart was "on a displaced list" (Dkt. No. 149 ¶58 *citing* Harrison Dep. (Dkt. No. 136) 57:9-14). On July 21, 2020, Stewart made a complaint to Camille Dessaw in Nissan Human Resources when she contacted him to schedule an exit interview despite the fact that he still had several job interviews scheduled, including the interview for the Iowa Fixed Operations role (Dkt. No. 149 ¶84 *citing* Stewart Decl. (Dkt. No. 150) ¶61).

Stewart had 20 years of tenure and vast education and experience with Parts, Service and Sales, Dealer Relationships, Dealer Profitability with Fixed Operations, Analytics, and working with dealers on Aftersales, (Dkt. No. 156, ¶14 *citing* Stewart Decl. (Dkt. No. 150) ¶¶48-50) and was one of only two candidates that applied for the role (Dkt. No. 149, ¶¶ 55, 56 *citing* Dessaw Dep. (Dkt. No. 133) at 229:15-230:17); Dep. Ex. 13). Shortly before Stewart was terminated, Harrison lied to Stewart, telling him that another candidate had been selected (Dkt. No. 149 ¶56 *citing* Stewart Decl. (Dkt. No. 150) ¶50).[11] Stewart's employment ended on August 4, 2020.

Erik Anderberg had been unemployed for approximately ten months when he interviewed for a Regional Service Lane Analyst position with Regional Aftersales Manager Greg Ebbs on July 9, 2020 (Dkt. No. 149 ¶58; *citing* Anderberg Dep. Ex. 2 at Nissan_000938 (Page 10 of 20 of Dep. Ex. 2 in Dkt. No. 161-10). Anderberg had a "Total Score Primary Questionnaire of 200, [for the Fixed Operations position] while

---

[11] If, as Plaintiff suspects, a management directed transfer was already in the works, Harrison's statement would not have been a lie.

15

the other two candidates, Stewart and another current employee, had scores of 300" (Dkt. No. 149 ¶56 *citing* Dessaw Dep (Dkt. No. 133) Ex. 13; Harrison Dep. (Dkt. No. 136) 75:5-21).

Anderberg claimed that during the July 9, 2020 interview Ebbs encouraged him to apply for the Fixed Operations role at issue (*Id.*, ¶56 *citing* Anderberg Dep. 42:13-17; 45:22-25 (Dkt. No. 161-10)); but offered no explanation for why it took him over a month to do so (Dkt. No. 149, ¶58 *citing* Anderberg Dep. Ex. 2 Nissan_000934 (Page 6 of 20 of Dep. Exhibit 2 in Dkt. No. 161-10) or how he got an interview so quickly (the next day) (*Id.*). Hiring Manager Scott Harrison testified that Ebbs told Harrison that Anderberg was "somebody that I should talk to" (Dkt. No. 149 ¶58 *citing* Harrison Dep. 40:2-13 (Dkt. No. 136)) – possible code for a management directed transfer. Apparently so, because Anderberg received an offer less than 24 hours after his first (and only) interview with Harrison (Dkt. No. 149 ¶56 *citing* Anderberg Dep. Ex. 2, Nissan_000943 (Page 15 of 20 in Dep. Ex. 2 of Dkt. No. 161-10).

#### Planner, Recalls & Campaigns (P6)

Stewart applied for the Planner, Recalls & Campaigns position. Like most of the other positions, P6 was only posted for a handful of days – five in this case (Dkt. No. 149 ¶56 *citing* Yu Dep. (Dkt. No. 141) 29:11-21). Like many of the other positions, the chosen candidate had a lower primary questionnaire score and did not appear on the candidate list (*Id.*, *citing* Yu Dep. 46:11-47:19). Yu acknowledged that this was a management directed transfer (*Id.* at 28:10-15) and that Stewart had the

16

requisite experience, but claimed McDuffie was more qualified because he was "in the role already" (*Id.* at 62:18-25). When asked why he thought the chosen candidate received an offer and he did not, Stewart testified that he and the other older workers were "flagged," because "none of us who were older workers received a job offer, although we had multiple interviews. We had extremely good interviews. We were eminently qualified. This is one of the positions that I was a slam dunk for. There is no way they could have gotten another person with my analytical skills with my engineering degree, that understood the process of the National Highway Traffic Safety Administration who had worked in that. […] And then they informed [me] that they weren't going to hire me… and I know that I was flagged because of my age…" (*Id. citing* Stewart Dep. (Dkt. No. 126) at 137:17-144:18; Stewart Decl. (Dkt. No. 150) ¶¶51, 53).

<u>Senior Planner, Client Journey Technology (P7)</u>

Stewart applied for the Senior Planner, Client Journey Technology position. Nissan's records for this position are a real head-scratcher. Like many of the other roles, the posting was not visible for long (Dkt. No. 149 ¶67 and Dkt. No. 156 ¶16 *citing* Exhibit Z (Dkt. No. 161-11) Senior Planner, Client Journey Technology Workday documents: Nissan_000709-12 and 1442-1457). Plaintiff applied on July 22, 2020 (Dkt. No, 149 ¶65 *citing* Stewart Dep. (Dkt. No. 126) 156_19-157:5) and was advised he was not being considered the next day (*Id. citing* Stewart Dep. 159:24-160:2). An offer was then made on August 4, 2020 to a younger candidate (Dkt. No. 149 ¶67 and PSAF ¶16 *citing* Dkt. No. 161-11 Workday documents:

17

Nissan_000709-12 and 1442-1457 at Nissan_1451-52), but the chosen candidate does not appear on the list of candidates for this position (Dkt. No. 149 ¶67 *citing* Dessaw Dep. (Dkt. No. 133) 195:20-196:2, Ex. 12 at Nissan_001422) (SA2). This may have been a management directed transfer but Nissan documents reflect that the chosen candidate, substantially younger 34-year-old Andrew Chesnut, received an offer but remained in his Analyst II – Customer Quality role – the same position he has held since August of 2017 (*Id.* citing Dkt. No. 161-11 at Nissan_000709 – 12 and 1445).

<u>Commercial Sales Manager (P8)</u>

Stewart applied for the Commercial Sales Manager position. Yet again, Nissan's records point to a management directed transfer: the chosen candidate Mark Namuth applied on July 7, 2020 (Dkt. No. 149 ¶71 *citing* Stewart Dep. (Dkt. No. 126) Ex. 26 at Nissan_0964), received and declined an internal offer letter two days later, July 9, 2020 (*Id. citing* Dep. Ex. 27 at Nissan_1842) and acknowledged an internal offer letter on July 13, 2020 (*Id. citing* Nissan_1843). Namuth also does not appear on a list of candidates (Dkt. No, 149 ¶71 citing Dessaw Dep. (Dkt. No. 133) 208:16-209:1, Dep. Ex. 12 at Nissan_001959) (SA7) and Nissan documents do not reflect Namuth or any other candidate being interviewed (*Id., citing* Stewart Dep (Dkt. No. 140) Exs. 26 and 27). And like the "view job application" documents in P1, the first version produced by Nissan contains personal information including age while the later-produced version of the same documents does not (*Id. citing* Stewart

Dep. (Dkt. No. 126) Ex. 26 (Nissan_00963-970) for comparison to Exhibit AA (Dkt. No. 161-12) Nissan_001839-45).

Senior Fixed Operations Manager with Infiniti (P9)

Stewart applied for the Senior Fixed Operations Manager position with Infiniti. Nissan at least acknowledges the management directed transfer in this instance (Dkt. No. 149 ¶75 *citing* Dessaw Dep. (Dkt. No. 133) 198:2-17), claiming that the requisition had been closed because "none of the candidates seemed qualified," (*Id.*) a material fact Stewart could not investigate because the documents produced relating to this position are missing nearly all the relevant sections (Dkt. No. 149 ¶73 fn 15 *citing* Stewart Dep. (Dkt. No. 126) Exs. 10, 13, 16, 19, 22, 24, 29, 31 (8 pages), Stewart Exhibit 26 (7 pages), to Stewart Exhibit 28 (2 pages). Stewart Dep Exhibit 28, relating to P9, does not contain any of the necessary information to evaluate the hire. This was a management directed transfer (Dkt. No. 149 ¶76 *citing* Dessaw Dep. (Dkt. No. 133) 198:2-17).

*Stewart and Others Make Complaints of Age Discrimination*

In mid-July, Stewart reiterated his age discrimination concerns to his manager Lisa Cicchini because older workers were not getting hired for any jobs (Dkt. No.149 ¶¶82 *citing* Stewart Decl. (Dkt. No. 150) ¶60). Cicchini *did not* report the complaint and Nissan did not investigate (Dkt. No. 149 ¶83). Several other displaced older workers made similar complaints around that time period (Dkt. No. 149 ¶84 *citing* Leiter Dep. (Dkt. No. 153) 44:17-45:15, 67:25-68:10, 77:12-82:10; Monohan Dep. (Dkt. No. 161-1) 140:20-143:8, 147:11-148:4)

19

On July 21, 2020, Stewart was taken aback when Nissan Human Resources representative Camille Dessaw (HR) contacted him to schedule his exit interview *when he was still actively interviewing* (and had not even applied for the P10 position discussed below); Stewart told Dessaw he believed he was being discriminated against because of his age (Dkt. No. 149 ¶84 *citing* Stewart Decl. (Dkt. No. 150) ¶61)

<u>Senior Planner, Campaign Acceleration and</u>
<u>Special Projects (P10)</u>

Stewart applied for the Senior Planner, Campaign Acceleration and Special Projects position. On July 8, 2020, Camille Dessaw (HR) sent an email to external Kelly recruiters Stephanie Aldridge, Justin Rippetoe and Sabrina Sutcliffe, with a cc to Eric Ledieu (Dkt. No. 149 ¶79 citing Dessaw Dep. (Dkt. No. 119) Ex. 7). The email named Bill Dodson, Greg Leiter, Brad Boland, Douglas (Kiernan) Monohan, Wesley Oda, Kasey Yost and Plaintiff Matthew Stewart as Nissan employees who "have been displaced and have until the end of the month to secure another internal role…"; asked the recruiters to "submit them to the hiring manager for review ASAP"; and told the recruiters to tell the hiring manager "the employee's status, and schedule interviews as soon as possible if the manager has interest" (*Id.*). Plaintiff applied for the Senior Planner position on July 22, 2020 (Dkt. No. 149 ¶ 77 citing Stewart Dep. (Dkt. No. 126) 160:4-15). Despite HR's directive, Yu was not advised of the existence of the displaced list until weeks later, on July 28, 2020 (*Id.* ¶ 79 *citing* Yu Dep. (Dkt. No. 141) 79:10-24; Ex. 2). More troubling, the email from external recruiting does not list Stewart as "displaced," and Yu was not advised that

Stewart was a displaced candidate until after HR put its finger on the scales and advised Yu that it would be "more difficult to make an offer to the candidate who needed relocation (Stewart)." (*Id.* Ex. 20). Stewart expressed concerns that someone in management had sabotaged his prospects because he had shared his experiences and education with Yu in their first three interviews[12] and been advised that he was the top candidate for the position (Dkt. No. 149, ¶79 *citing* Stewart Decl. (Dkt. No. 150) ¶¶51-53). But Yu's demeanor changed from "night to day from interview three to four," and Stewart did not receive an offer (*Id.*) Chosen candidate Jeffrey Campbell applied for the role on July 21, 2020, and received an offer on July 30, 2020, just nine days later (Dkt. No. 149, ¶79 *citing* Yu Dep. (Dkt. No. 141) 103:10-13; Dep. Ex. 28 at Nissan_001745).

> *Stewart and Six Other Older Workers are Terminated; Stewart's Job Responsibilities are Allocated to Younger Employees*

Stewart and the other six older workers, none of whom had been offered a different position, were terminated on August 4, 2020 (Dkt. No. 149 ¶¶85, 86 *citing* Stewart Dep. (Dkt. No. 140) Ex. 33 at Nissan_000192). Stewart's job responsibilities were divided between two younger and much less experienced FSMs, Dan Pauken and Ricardo Razo (Dkt. No. 149 ¶85 *citing* Stewart Decl. (Dkt. No. 150) ¶¶25-27; Ledieu 30(b)(6) Dep. (Dkt. No. 137) Ex. 16 (Nissan_003407).

---

[12] Nissan's 56.1 statement claims that Stewart applied for this position on July 22, 2020 (Dkt. No. 149 ¶77) and was informed he had not been chosen the same day *(Id.*, ¶78). This seems unlikely since Stewart was interviewed four separate times (*Id.*, ¶79 *citing* Stewart Decl. (Dkt. No. 150) ¶51).

*Stewart's Position "Reappears"*

Less than eight months later, with older worker Stewart out of the picture, Nissan reinstated Stewart's "eliminated" District 2402 and transferred Simeon Taskov to Stewart's prior job (Dkt. No, 149, ¶85 *citing* Bedard Decl. (Dkt. No. 160) ¶¶4-7 and Ledieu Dep (Dkt. No, 124) Ex. 37 (Nissan_004748) (SA8) (listing Rey Razo as DSM for region 2401 Minesota/Iowa/Nebraska and Simeon Taskov as DSM for region 2402 Wisconsin – Stewart's old district).

## SUMMARY OF THE ARGUMENT

The District Court improperly granted summary judgment on Stewart's ADEA claim that Nissan failed to hire him for the Fixed Operations Manager (Iowa) position. The record contains triable facts that Nissan's stated reasons for selecting the younger, less qualified external candidate rather than Plaintiff Stewart were pretextual. First, Stewart was entitled to a review of the record with all inferences drawn in his favor. Instead of doing so, the Court repeatedly relied on disputed facts or drew inferences in favor of the moving party. This was error. Second, the Court appears to have disregarded all but a tiny fraction of the available evidence, choosing instead to narrow its evidentiary inquiry to facts relating solely to the Fixed Operations Manager role. Stewart was entitled to rely on *all* admissible evidence, including the timeline of Nissan's alleged "reorganization" and all nine applied-for positions, nearly all of which contain a myriad of disputed material facts, shifting reasons, and contradictions.

Stewart's response to Nissan's 56.1 Statement contains countless statements made by Nissan that were demonstrably false or at minimum disputed. These disputes are material to the issue of pretext. Nissan's documents relating to both its alleged "reorganization" and the hiring process as a whole were internally inconsistent, conflicted with record testimony, or both. Plaintiff has established pretext by providing record evidence of Nissan's shifting explanations, hiring irregularities, inconsistent documentation and comparative qualifications between Plaintiff Stewart and the younger, less experienced external chosen candidate. For all of these reasons, summary judgment was improper, and Stewart's failure to hire claim should be presented to a jury.

## ARGUMENT

### I.     Standard of Review

The appellate court's review of a district court's grant of summary judgment is *de novo*, "construing all facts and drawing all reasonable inference in the light most favorable to [Stewart], the non-moving party. *Mullin v. Temco Mach., Inc.*,732 F.3d 772, 776 (7th Cir. 2013) (citation omitted). Summary judgment is appropriate if there are no genuine issues as to any material fact, entitling the moving party to judgment as a matter of law. *Id.*, *citing* Fed. R. Civ. P. 56 (remaining citation omitted).

Summary judgment is not a trial on the papers. The district's court's role is not to "sift through the evidence, pondering the nuances and inconsistencies…" The district court's only task – and it is a narrow one – is to determine the existence of

material facts in dispute. *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Of particular import here, the District Court was required to evaluate the voluminous record "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765-66 (7th Cir. 2016) ("all evidence belongs in a single pile and must be evaluated as a whole"). Where, as here, that pile of evidence evaluated in its entirety reflects countless and important questions of material fact that could lead a jury to find for Stewart, summary judgment was improper.

## II. Stewart Presented Sufficient Evidence that He Was Not Hired Because of His Age

The District Court makes only passing reference to Stewart's burden of proof, stating (correctly) that "[a]n ADEA claim requires a plaintiff to prove that 'but for his age, the adverse action would not have occurred'" (Dkt. No. 204 A-7 (citation omitted)).  Stewart argued, and the District Court appears to have conceded, that Stewart was not required to process his evidence through the *McDonnell Dougla*s method, or that if he was, he had done so (*Id. see also* Pl. Resp. Brief (Dkt. No. 157) p. 13). The District Court also correctly stated the appropriate question at the summary judgment phase, "whether the evidence as a whole would allow a reasonable jury to find that the plaintiff suffered an adverse job action because of his age" (Dkt. No. 204 A-7).  The Court's error was in failing to take to heart the teachings of *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016), which require that "[r]egardless of the plaintiff's chosen method(s) at the summary judgment stage the court must consider *all admissible evidence* to decide whether a

24

reasonable jury could find that the plaintiff suffered an adverse action because of his age." *Murphy v. Caterpillar, Inc.*, 140 F.4th 900, 912 (7th Cir. 2024) (*citing Ortiz*). In making its determination, the court was obligated to evaluate the entire record discussed in more detail in Sections III and IV below. With all inferences drawn in Stewart's favor, the factual narrative would read something like this:

> Stewart's FSM role was targeted for elimination in early 2020 along with the roles of other older workers, likely as part of their yearly "calibration" process (Dkt. No. 149 ¶¶8-15, 20-22, 32, 33, 81, 89, 91, 95)[13]. Nissan identified individuals, not positions, based at least in part on the cost savings associated with terminating older employees (*Id.*, see also ¶¶96 – 100). This was a pattern, something Nissan did every handful of years to shed older workers (*Id.*, ¶¶90-91).  In order to effectuate the claimed "reorganization" Nissan also "eliminated" other roles, but offered younger impacted individuals "management directed transfers" that kept them employed (*Id.*, ¶¶19, 20).
>
> Stewart had nearly 20 years of experience with Nissan and had expressed a willingness to relocate, but was not given a management directed transfer to any of the newly-created roles (*Id.* ¶¶21 – 32). Decision makers were aware of and factored age into their decisions about who to terminate and who to keep (*Id.* ¶33). Stewart was notified in June of 2020 that his employment would terminate in August of 2020 (*Id.* ¶¶34, 35). Stewart immediately expressed concerns to his supervisor about age discrimination (*Id.* ¶82). Stewart applied for roles he believed were open, but Nissan either already had people in mind for those roles (i.e. made management directed transfers) or made

---

[13] Because this narrative is merely a summary of the statement of facts above, the underlying citations are omitted here.

25

certain to interfere with the hiring process so that Steward did not receive an offer (*Id.* ¶¶37 – 81). Throughout that process Stewart and other displaced workers continued to complain of age discrimination to management and discuss amongst themselves ageist comments and experiences (*Id.* ¶¶82 – 84; 90 – 92). Stewart was understandably upset when HR contacted him to set up an exit interview when he was still applying and interviewing for roles and again reported age discrimination (*Id.* ¶84).

It didn't matter; his employment terminated shortly thereafter, on August 4, 2020 (*Id.* ¶85). His job responsibilities were divided temporarily between two younger FSMs, Rey Razo (age 36) and Dan Pauken (39) but the District was not eliminated (*Id.* ¶85). Said another way, Stewart, not his job, was "reorganized." Simeon Taskov, another younger worker, was moved into a "reappeared" Wisconsin District 2402 (Stewart's District) in or around May of 2021 (*Id.*).

With the benefit of the proper standards, there was more than sufficient evidence to determine that a reasonable jury could find for Stewart on his failure to hire claim.

### III. The District Court Erred by Failing to Construe All Facts and Draw All Reasonable Inference in the Light Most favorable to Stewart and by Making Improper Credibility Determinations.

"The maxims of summary judgment are familiar – no weighing the evidence, no credibility determinations, draw all speculative inferences in favor of non-movant – but they are more easily recited than applied." *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 928 (7th Cir. 2020). Stewart concedes that this directive is no small task by any measure, particularly where, as here, the summary judgment record is

26

hundreds of pages of briefing and thousands (*yes, thousands*) of pages of exhibits. But because summary judgment, as its name implies, is a final determination, and one that deprives a litigant of the opportunity to present his or her case to a jury, the directive, however tedious, must be followed. That is why the district court reviewing summary judgment must "focus on the most persuasive story possible on the non-movant's behalf when asking whether a verdict in [his] favor would be reasonable or could result only from irrational speculation." *Id.*

Furthermore, where factual disputes exist, the Court was obligated to credit Stewart's version at the summary judgment stage. *See, e.g. Hansen v. Fincantieri Marine Group, LLC.*, 763 F.3d 832, 836 (7th Cir. 2014) ( "A court may not choose between competing inferences or balance the relative weight of conflicting evidence; it must view *all the evidence in the record* in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party.")(emphasis added); *see also Orton-Bell v. Indiana*, 759 F.3d 768, 773 (7th Cir 2014) (same). Where the District Court weighed in on factual disputes, it improperly credited Nissan's version. This was error.

Relatedly, the district court "may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts." *Tuttle v. Serv-U-Success*, No. 10-1426, 2013 U.S. Dist. LEXIS 5514, at *4 (C.D. Ill. Sept. 19, 1988) *citing Washington v. Haupert*, 481 F.3d 543, 550 (7th Cir. 2007); *see also Moore v. County of Cook*, No. 98-3678, 1999 U.S. App. LEXIS 16918 at *6-7 (7th Cir. July 19, 1999) (credibility determinations and weighing of the evidence are jury functions)

27

(citation omitted). "In an employment discrimination suit, where credibility and intent are pivotal issues, these standards apply with added rigor,"[14] *Moore* at * 7, *citing Courtney v. Biosounds, Inc.* 42 F.3d 414, 418 (7th Cir 1994).

Because the required maxims were not applied here, summary judgment was not appropriate.

### A. Stewart Did Not Receive the Benefit of Reasonable Inferences Regarding the Claimed "Reorganization"

The Court should have made appropriate inferences and avoided credibility determinations regarding the claimed "reorganization." Doing so would obligate the Court to credit Stewart's reasonable interpretation of that "reorganization," which was that its purpose was to identify older workers for elimination. The facts surrounding the "reorganization" are hotly contested to say the least: There is only a single paragraph[15] in Nissan's 56.1 statement "reorganization" section that is not described by Stewart as a disputed material fact (Dkt. No. 149 ¶¶8-33). As described in the Statement of Facts above and discussed in more detail in Section IV below, the events leading up to and creating Stewart's status as an unwitting job

---

[14] The Seventh Circuit has made clear that there is not a separate rule of civil procedure in employment discrimination cases; the "added rigor" language requires that the "court should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often, though not always, will be." *Weed v. Evanston Hosp. Corp.*, 1998 U.S. Dist. LEXIS 19244 at *8 (N.D. Ill. Dec. 4, 1998) *citing Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997).

[15] Paragraph 30 asks Plaintiff to admit that he did not submit an application to any of the additional FSM positions in Signature Direct.

28

applicant are part of the entirety of the record; that evidence warranted consideration with all proper inferences drawn. Failing to do so was error.

### B. Stewart Did Not Receive the Benefit of Reasonable Inferences Regarding All Ten Positions for Which He Applied – Not Just the Position at Issue

The Court should have made appropriate inferences and avoided credibility determinations regarding each and every one of the "ten open positions at Nissan" (Dkt. No. 204 A-2) – not just the single position not dismissed by the District Court. As an initial matter, only a few of these roles may have been actually "open." There is either record evidence (P6 and P9) or a disputed material fact regarding whether most of the positions were open at all (*see* Statement of Facts, *supra*). The most persuasive story possible for non-movant Stewart obligates the Court to accept that Nissan's attempt to characterize these positions as "open" is one of the many ways they forced older workers out the door – by limiting their options to remain employed after being advised they had approximately two months to locate another internal role.

The District Court also completely ignored important evidence regarding countless hiring record anomalies. These were not minor discrepancies; rather, each one created a question of material fact: First, was Stewart willing to locate? Stewart points to plenty of evidence to support that he was, while Nissan relies on different documents and testimony from decision-makers stating their "understanding" of

29

Stewart's relocation preferences, documentary evidence to the contrary notwithstanding (Dkt. No. 149 ¶¶21, 24-28).[16]

Second, did hiring managers have knowledge of Stewart's age or his complaints regarding his age? Nissan claims the latter is undisputed; Stewart presented evidence to the contrary (Dkt. No. 149 ¶82 *citing* Stewart Decl. (Dkt. No. 150) ¶60); (Dkt. No. 149 ¶84 *citing* Leiter Dep. (Dkt. No. 153) 44:17-45:15, 67:25-68:10, 77:12-82:10; Monohan Dep. (Dkt. No. 161-1) 140:20-143:8, 147:11-148:4). As to the former, Nissans' reply claims, *without citation to any record evidence*, that "[the material and undisputed evidence shows that the decisionmakers were not aware of Plaintiff's age…" (Dkt. No. 168 p. 2). Stewart, on the other hand, points to documents produced relating to P1 and P8 available to hiring managers that reference his age, among other demographic data – documents that also call into question Nissan's document production, which produced multiple versions of the same documents – one version that included certain demographic information (age, disability status, etc.) and another version that did not (Dkt. No. 149 ¶71 *citing* Stewart Dep. (Dkt. No. 126) Ex. 26 (Nissan_00963-970) for comparison to Exhibit AA (Dkt. No. 161-12) Nissan_001839-45). Stewart also cites to deposition and declaration testimony suggesting that decision-makers discussed age in the context of retirement eligibility and that decision-makers had access to employee (including Stewart's) Workday personnel materials that include age, date of birth and years of service, among other things (Dkt. No. 149 ¶33 *citing* McBane Dep (Dkt. No. 139) Ex.

---

[16] See extensive citations regarding Stewart's mobility *supra*, p. 11-12.

25 (Nissan_003972) reflecting "retirement eligible"; Dessaw Dep. (Dkt. No. 119) Ex. 17 (Stewart Workday materials with photo and age information available to members of management).

Third, were efforts being made to help (or hinder) his search given his status as a displaced worker? Stewart points to emails indicating that on July 8, 2020, Nissan Human Resources Representative Camille Dessaw advised recruiters to submit the resumes of listed displaced workers (Stewart among them) and to ask the hiring manager to schedule interviews as soon as possible (Dkt. No. 149 ¶79 *citing* Dessaw Dep. (Dkt. No. 119) Ex. 7). Despite this directive, Henry Yu, the hiring manager for two of the roles – P6 and P10 – testified that he was not told about the displaced list until July 28, three days before Stewart's termination-day (*Id.* ¶ 79 *citing* Yu Dep. (Dkt. No. 141) 79:10-24; Ex. 2). There is no record evidence suggesting that any of the other hiring managers were notified of the displaced list (*Id.*). It is even more troubling that the displaced list sent to Yu did not contain Matthew Stewart's name (*Id.*) The Court was required to consider Yu's testimony that "the three [final] candidates were equally qualified for the role; that HR was advising Yu that making an offer to a candidate who needed relocation (Stewart) would be "more difficult," (*Id.* Ex. 20) along with Stewart's testimony that Yu's demeanor changed from "night to day from interview three to four" (Dkt. No. 149 ¶ 79 *citing* Stewart Decl. (Dkt. No. 150) ¶¶51-53).

Relatedly, the Court was required to consider Stewart's complaints to his boss and Human Resources alleging age discrimination. As expected, Nissan tries to

sidestep the obvious credibility determinations at issue by framing his complaints (and the complaints of other older workers) as "not discussed" and "not reported," (Dkt. No. 149 ¶¶ 81-84 *citing* Stewart Decl. (Dkt. No, 150) ¶¶ 60, 61; Leiter Dep. (Dkt. No. 153) 44:17-45:15, 67:25-68:10, 77:12-82:10; Monohan Dep. (Dkt. No. 161-1) 140:20-143:8, 147:11-148:4)). But those are disputed facts for which Stewart, *not Nissan*, was entitled to a favorable inference. Said another way, the Court was obligated to consider the possibility that Dessaw and others were not truthful, and that Stewart's complaints had been discussed and/or held against him in the hiring process.

Nissan's hiring process for the positions Stewart applied evidence pretext. As set forth above, Nissan's failure to communicate and enforce the displaced candidate list with its recruiter, the timing and communications to and from the hiring managers, Nissan's countless deviations from hiring protocols, and the comparative qualifications of the younger employees all support an inference of pretext for the hiring decision at issue.

Drawing all inferences in favor of Stewart, a reasonable factfinder could believe that someone (or multiple individuals) had intervened to prevent Stewart from receiving an offer – because of his age, because of his complaints, or both.

### IV.  The District Court Erred by Failing to Consider the Entire Record

Hiring decisions are not made in a vacuum; they take place in complex organizational contexts. And while Stewart concedes, for purposes of this appeal, that only one of the hiring decisions is actionable, that does not mean that the Court

should have only considered facts relating to that single hiring decision in making its summary judgment decision, which is what it did (Dkt. No. 204 A9-A10). Indeed, Stewart's evidence regarding all of the positions for which he and other displaced employees applied are relevant as pattern and process evidence that demonstrates irregularities and shifting explanations for both the "reorganization" and the resulting alleged "openings."

Although the Court's opinion *references* the proper standard – consideration of *the entire* evidentiary record – a comparison of the summary judgment record (Dkt. Nos.70-103, 118-142, 149-157, 160-165, 168, 169, 172-174, 176 and 193) and the Memorandum and Opinion (Dkt. No. 204 A1-12) make it clear that very little of the record was reviewed, let alone evaluated. Indeed, the Court's background section is drawn from approximately 20[17] of well over 100 of the Rule 56.1 statements, nearly all of them described by Stewart as disputed material facts (Dkt. No. 149).

The Court's analysis of the failure to hire at issue in this appeal contains three paragraphs. First, the Court points out that the hiring manager's choice "had a basis in fact," and that [the Court] is not in a position to weigh the relative value of scores on assessments and experience with Defendants against more recent and extensive relevant job experience," (Dkt. No. 204 A-9 *citing Cunningham v. Austin*, 125 F.4th 783, 789 (7th Cir. 2025)). The Court then suggests, despite Stewart's detailed analysis of a sham "reorganization" targeting older workers, countless

---

[17] The Court's "Background" section appears to be drawn from Defendants' 56.1 Statement (and Plaintiff's responses thereto) numbers 5, 34, 35, 37, 42, 46, 50, 54-59, 60, 65, 69, 73,77, 82-85, and 88 (Dkt. No. 149).

anomalies in the hiring process overall, and Stewart's "eliminated" position magically reappearing less than eight months after he was terminated, that he "has presented no other evidence, such as evidence of pretext…" (Dkt. No. 204 A-9). Stewart *vociferously* disagrees.

### A. Stewart Established Pretext by Raising Questions of Fact and Credibility Regarding the Claimed "Reorganization"

The pretext analysis is not limited to whether "Harrison and Ebbs had 'nondiscriminatory reasons for preferring' Anderberg" (Dkt. No. 204 A-10). The pretext analysis must incorporate the record as a whole – from the beginning of the story to the end. And it is the beginning (elimination of older individuals, not roles) and the end (Stewart, not his position, being "eliminated" with the position returned eight months later) that really matters.

From the beginning, the court makes no mention whatsoever of Nissan's statements of undisputed material fact numbers 6 – 33, all regarding the disputed "reorganization" and the pretext Plaintiff believes those disputed facts support. Stewart was, however, entitled to rely on these facts, and the disputed nature of those facts, for context and color to the hiring decision at issue. Stewart was not poking around looking to improve his lot with his current employer. The hiring decision at issue took place in the context of a "reorganization" riddled with fancy corporate buzzwords and phrases like "align[ment] [to] its regional footprint" (Dkt. No. 149 ¶8); "newly reorganized regional structure" (¶10); "consolidat[ion] and reorganiz[ation] (¶15); and "impacted" positions (¶19). This alleged "reorganization" is what forced Stewart to become a job seeker in the first instance. That context

cannot be overlooked when evaluating whether Stewart put forth sufficient evidence of discrimination.

Stewart has raised innumerable questions of fact regarding the veracity of the claimed "reorganization," offering evidence that his position and the positions of other older workers were targeted for elimination from the beginning. The Court was obligated to consider the endless holes Stewart poked in Nissan's corporate-speak narrative: (1) the documents indicating that calibration and individual employee ranking came before discussion of role elimination (see, e.g. Ledieu 30(b)(6) Dep. Ex. 14 (Dkt. No. 137, pp. 352-353( (SA11-12); Ledieu 30(b)(6) Dep. Ex. 10 at Nissan_003353 (Dkt. No. 137 p. 266) (SA37); Ledieu 30(b)(6) Dep. Ex. 7 at Nissan_04240 (Dkt. No. 137 p. 195) (SA20); Ledieu 30(b)(6) Dep. Ex 8, Nissan_002766-2815 (Dkt. No. 137 pp. 204 – 252) (Excerpt at SA24-29); Ledieu 30(b)(6) Dep Ex. 10, Nissan_003366-3371 (Dkt. No. 137, pp. 279-284) (SA39-44); Ledieu 30(b)(6) Dep. Ex. 11, Nissan_004432 (Dkt. No. 137, pp. 291-294) ("Scenario" and "Inside Sales Payback 5 years" tabs, SA45-46); Ledieu 30(b)(6) Dep. Ex. 12, Nissan_004022-4027 (Dkt. No. 137 pp. 337 -342) (SA49-54); (2) the fact that Stewart was mobile (citations regarding mobility *supra*, p. 11-12) but not considered for any management directed transfers; (3) the fact that Nissan's claimed "large" versus "small" dealers analysis was strangely applied to Stewart's district (discussion of same, *supra*, p. 9-10); and (4) the fact that Stewart's job responsibilities were divided between two younger and less experienced workers and then pieced back together for yet another younger and less experienced worker (Dkt. No, 149, ¶85

35

*citing* Bedard Decl. (Dkt. No. 160) ¶¶4-7 and Ledieu Dep (Dkt. No, 124) Ex. 37

(Nissan_004748) (SA8) (listing Rey Razo as DSM for region 2401

Minesota/Iowa/Nebraska and Simeon Taskov as DSM for region 2402 Wisconsin –

Stewart's old district)) -- all ignored at the district level. This was error.

### B. *Stewart Established Pretext by Raising Questions of Fact and Credibility Regarding the Entirety of the Hiring Process*

Similarly, the hiring process *in its entirety* – not simply a myopic and cursory

comparison of the stated qualifications of Stewart and the much younger candidate

who received the role – was required. Had the Court done that work, it would have

considered the following evidence:

- That hiring managers had access to and/or considered age in making their hiring determinations (Dkt. No.149 ¶37 *citing* Stewart Dep. (Dkt. No. 126) Ex. 26 (Nissan_00963-970) for comparison to Exhibit AA (Dkt. No. 161-12) Nissan_001839-45) (noting that Ex. 26 contains a "duplicates" section while Exhibit AA does not; Ex. 26 contains a "personal information" section that includes age while Ex. AA does not);

- That hiring managers were advised of Stewart and other older workers' status as "displaced," (HR Rep email to recruiters advising of displaced workers names Stewart: (Dkt. No. 149 ¶79 *citing* Dessaw Dep. (Dkt. No. 119) Ex. 7); Hiring manager Harrison knows Steward is displaced: (Dkt. No. 149 ¶58 *citing* Harrison Dep. (Dkt. No. 136) 57:9-14) Hiring manager Yu not timely advised (Dkt. No. 149 ¶79 *citing* Yu Dep (Dkt. No. 141) 79:10-24; Exs. 2 and 20);

- That only a handful of the positions for which Stewart applied were even "open" positions because most of the roles (P1, P4, P5, P6, P7, P8 and P9) were filled with management directed transfers (**P1**: Dkt. No. 149 ¶39 and Dkt. No. 156 ¶11 *citing* Workday documents relating to the Commercial Sales Manager position establishing limited length of time position was open: Exhibit U (Dkt. No. 161-6) Nissan_000635-638; 721-722, 1915-1922 at Nissan_001915); **P4**: Dkt. No. 149 ¶ 52 *citing* Dessaw 30(b)(6) Dep. (Dkt. No. 134) Ex. 12 at Nissan_002296) (SA3); Dkt. No. 156 ¶13 *citing* Exhibit X (Dkt. No. 161-9) Consumer Credit Manager Workday documents: Nissan_000554-558 at Nissan_000558); **P5**: Dkt. No. 149 ¶56 *citing* Anderberg Dep. Ex. 2, Nissan_000943 (Page 15 of 20 in Dep. Ex. 2 of Dkt. No. 161-10); **P6**: (Dkt. No. 149 ¶56 *citing* Yu Dep (Dkt. No. 141) 28:10-15); **P7**: (Dkt. No. 149 ¶67 *citing* Dessaw Dep. (Dkt. No. 133) 195:20-196:2); **P8**: (Dkt. No. 149 ¶71 *citing* Stewart Dep. (Dkt. No. 126) Ex. 26 at Nissan_0964) and Dep. Ex. 27 at Nissan_1842 Nissan_1843); **P9**: Dkt. No. 149 ¶76 *citing* Dessaw Dep. (Dkt. No. 133) 198:2-17;

- That the individual chosen for the role for most of the ten positions Stewart applied for does not show up in Nissan hiring documents as a candidate for the job (Dessaw 30(b)(6) Dep. (Dkt. No 120) Ex. 12 (SA1-7);[18]

---

[18] P1: Nissan_001925 chosen candidate Sanchez not listed (SA4); P3: Nissan_002594 chosen candidate Widenhouse not listed (SA6); P4: Nissan_002296 chosen candidate White not listed (SA3); P6: Nissan_001982 chosen candidate McDuffie not listed (SA1); P7: Nissan_001422 chosen candidate Chestnut not listed (SA2); P8: Nissan_001959 chosen candidate Namuth not listed (SA7); P10: Nissan_002001 chosen candidate Campbell not listed (SA5).

- That it took the chosen candidate for the Fixed Operations role at issue (Anderberg) nearly a month between allegedly being told to apply for the role and actually applying (Dkt. No. 149, ¶58 *citing* Anderberg Dep. Ex. 2 Nissan_000934 (Page 6 of 20 of Dep. Exhibit 2 in Dkt. No. 161-10);

- That the hiring manager for the Fixed Operations role (Harrison) lied to Stewart and told him the role had been filled when it had not (Dkt. No. 149 ¶56 *citing* Stewart Decl. (Dkt. No. 150) ¶50);

- That hiring manager Henry Yu was not advised that Stewart was on a displaced list until several days before Stewart's termination, and that Human Resources discouraged Yu from making an offer because he would require relocation (Dkt. No. 149 ¶ 79 *citing* Yu Dep. (Dkt. No. 141) Ex. 20).

The Court's improperly narrow inquiry violated the holding of *Ortiz* requiring the fact-finder to consider <u>all admissible evidence</u>. *See, Murphy v. Caterpillar, Inc.*, 140 F.4th 900, 912 (7th Cir. 2024) (*citing Ortiz*). Stewart presented more than sufficient admissible evidence to support a finding in his favor, and thus summary judgment was improper.

## CONCLUSION

Summary judgment was improper on this record. This Court should reverse the district court's judgment and remand the case for trial.

38

Dated:  March 31, 2026

Respectfully submitted,

/s/ *Lisa L. Clay*
Attorney for Plaintiff-Appellant

Lisa L. Clay Attorney at Law, Ltd.
(ARDC No. 6277257)
2100 Manchester Rd., Suite 1603
Wheaton, IL 60187
630.456.4818
Email: lisa@clayatlaw.com

## FEDERAL RULE 32 (a)(7)(B) and 32(a)(5) COMPLIANCE

This brief complies with the type-volume requirement of Federal Rule of Appellate Procedure 32(a)(7)(B) and Circuit Rule 32(c) because this brief contains 10,268 words, as determined by the word-count function of Microsoft Word in Microsoft Windows 11 Pro excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(f). This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Circuit Rule 32(b) because this brief has been prepared in a 12-point Century font.


/s/ *Lisa L. Clay*

## CIRCUIT RULE 30(d) STATEMENT

The undersigned counsel for appellant Matthew Stewart hereby certifies, pursuant to Rule 30(d) that all materials required by Circuit Rule 30(a) and (b) are included in the Appendix accompanying this opening Brief. The Short Appendix attached hereto includes the judgment and memorandum of decision related to that judgment. The materials requested in Circuit Rule 30(b) are attached as Separate Appendix (Redacted); Separate Appendix (Sealed) is being filed under seal to protect the Defendants' requested confidential designation at the lower level.


/s/ *Lisa L. Clay*

## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2026, the Brief of Appellant and Appendix was filed with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

*/s/ Lisa L. Clay*

# APPENDIX

## TABLE OF CONTENTS FOR APPENDIX

Memorandum Opinion and Order, filed September 19, 2025................................. A-1

Judgment, filed September 19, 2025 .................................................................... A-13

**UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| Matthew Stewart, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 22-cv-4734 |
| v. | ) | |
| | ) | Hon. Jorge L. Alonso |
| Nissan North America, Inc., *et al.* | ) | |
| | ) | |
| Defendants. | ) | |

**Memorandum Opinion and Order**

Before the Court are Defendants Nissan North America, Inc. and Nissan Motor Acceptance

Corporation's motion for summary judgment against Plaintiff Matthew Stewart and various

motions to seal. For the reasons that follow, the Court grants Defendants' motion for summary

judgment and grants in part and denies in part the parties' motions to seal. Civil case terminated.

**Background**

The following facts are taken from the record and are undisputed or presented in the light

most favorable to Stewart, the non-moving party.

Stewart began working for Defendants in January 2001 as a Technical Specialist.

Defendants promoted Stewart to various different roles throughout his employment, until he

obtained the position Financial Services Manager in July 2015. Stewart worked in this position

until he was terminated on August 3, 2020.

On June 4, 2020, Stewart attended a call with Director of Sales Operations Eric Ledieu,

Regional Financial Sales Manager John McBane, and Human Resources Partner Camille Dessaw,

who informed Stewart that his current position would be eliminated due to an organizational

1

A-1

restructuring. On the same day, Stewart received a letter which provided that "his position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020." ECF No. 149 ¶ 35. The letter provided that Stewart could voluntarily separate at any time without receiving severance pay or stay at the company through August 3 and apply for open positions, receiving severance pay if he did not receive an offer for a comparable position.

Stewart applied to ten open positions at Nissan: Commercial Sales Manager ("P1"), Senior Dealer Operations Manager ("P2"), Upstream Remarketing Sales Manager ("P3"), Consumer Credit Manager ("P4"), Senior Fixed Operations Manager ("P5"), Planners, Recalls, and Campaigns ("P6"), Senior Planner, Client Journey Technology ("P7"), Commercial Sales Manager ("P8"), Senior Fixed Operations Manager ("P9"), and Senior Planner, Campaign Acceleration and Special Projects ("P10"). Stewart was not selected for any of these positions and was terminated on August 3, 2020.

As relevant here, the hiring manager for the P5 position was Scott Harrison. Ultimately, 32-year-old Erik Anderberg was selected for the position. Greg Ebbs informed Harrison that he had previously interviewed Anderberg, was impressed by his resume, and felt that he had the necessary aftersales experience for the role. Ebbs similarly noted a lack of Stewart's aftersales experience, which Harrison believed was evident from Stewart's resume. Specifically, Stewart had only a small window of aftersales experience approximately 20 years prior. Harrison ultimately made the decision to hire Anderberg in conjunction with Ebbs because he had "recent aftersales experience with General Motors, doing the exact role that [Defendants] were hiring for" and he had experience working directly with dealers. ECF No. 97 at 71:18–72:5.

In June and July 2020, Stewart informed Lisa Cicchini, his Areas Operations Manager and

2

A-2

direct supervisor, that he believed he was being subject to age discrimination. Stewart made similar complaints to Dessaw in late July and early August 2020. Stewart did not use the formal internal complaint process available to him. On May 24, 2021, Stewart filed a charge with the United States Equal Employment Opportunity Commission ("EEOC"), alleging that Defendants terminated him and refused to hire him for various positions because of his age and in retaliation for his complaints of age discrimination. On September 2, 2022, Stewart filed suit maintaining the same allegations under the Age Discrimination in Employment Act ("ADEA") 29 USC § 623(a)(1) and (d).

**Legal Standard**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). To defeat summary judgment, a nonmovant must produce more than a "mere scintilla of evidence" and come forward with "specific facts showing that there is a genuine issue for trial." *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 894, 896 (7th Cir. 2018). The Court considers the entire evidentiary record and must view all the evidence and draw all reasonable inferences from that evidence in the light most favorable to the nonmovant. *Horton v. Pobjecky*, 883 F.3d 941, 948 (7th Cir. 2018). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). However, "[t]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986). Ultimately, summary judgment is warranted

A-3

only if a reasonable jury could not return a verdict for the nonmovant. *Id.* at 248.

## Discussion

For the reasons that follow, Defendants' motion for summary judgment is granted.

### I.     Timeliness

Defendants argue that many of Stewart's claims regarding the at-issue employment decisions are untimely because he did not file a charge of discrimination with the EEOC "within 300 days after the alleged [discrimination] occurred." 29 USC § 626(d)(1)(B). Specifically, they argue that because Stewart filed his charge of discrimination on May 24, 2021, adverse employment decisions communicated to him before July 28, 2020—including Defendants' elimination of Stewart's position, Defendants' failure to hire Stewart for six of ten jobs, and Stewart's termination—are time barred. The Court agrees that the elimination of Stewart's position, Stewart's termination, and four of the ten refusals to hire are time-barred, but otherwise declines to grant summary judgment on timeliness grounds.

#### a.  Timeliness of Position Elimination and Termination Claims

On June 4, 2020, Stewart attended a call with Ledieu, McBane, and Dessaw, who informed Stewart that his current position would be eliminated. ECF No. 49 ¶ 34. On the same day, Stewart received a letter which provided that "his position will be eliminated or consolidated with another position(s) at the close of business on August 3, 2020." *Id.* ¶ 35. The letter provided that Stewart could voluntarily separate at any time without receiving severance pay or stay at the company through August 3, 2020 and apply for open positions, receiving severance pay if he did not receive an offer for a comparable position. *Id.* Defendants argue that these communications were sufficient to start the limitations period for Stewart's claims relating to his termination and the elimination

4

A-4

of his position. Stewart responds that the letter did not clearly convey that his termination was final and that the continuing violations doctrine otherwise saves his untimely claims. The Court agrees with Defendants.

"To start the limitations clock [for an employment discrimination claim], the employer's decision must be final, ultimate, and non-tentative, and the employee must receive unequivocal notice of it." *Wrolstad v. Cuna Mut. Ins. Soc'y*, 911 F.3d 450, 456 (7th Cir. 2018). Defendants' communication to Stewart serves as sufficient notice of both Stewart's termination and the elimination of his position to start the limitations period for his claims. *Delaware State Coll. v. Ricks*, 449 U.S. 250, 261 (1980) (holding that the limitations clock began to ran on the date an employee was notified that he would not receive tenure, despite the fact he could file a grievance as to the termination); *Wrolstad*, 911 F.3d at 456 (holding a defendant's letter informing plaintiff that it would sue if he pursued an appeal was sufficient to start the limitations period, even though the threat was contingent on actions of the plaintiff); *Dodson v. Nissan N. Am., Inc.*, No. CV-23-00939-DLR, 2025 WL 1135164, at *3 (D. Ariz. Apr. 16, 2025) (holding that a claim for wrongful termination and the elimination of a position from the reorganization at issue in this case began to accrue on the date that the plaintiff was informed his position was eliminated and he would be terminated if he did not find another role in the company); *Ashworth v. Main Line Hosps. Inc.*, No. CV 23-1534, 2024 WL 2747965, at *6 (E.D. Pa. May 29, 2024) ("A 'notice of termination [is not] rendered ambiguous by the mere potential for continued employment.'" (quoting *Watson v. Eastman Kodak Co.*, 235 F.3d 851, 85 (3d Cir. 2000))).

Stewart also argues that the continuing violations doctrine applies because "the effects of the past discrimination were continuing." ECF No. 157 at 11. His argument is misplaced because

5

A-5

the continuing violations doctrine is available only in employment discrimination cases concerning non-discrete acts, such as hostile-work environment claims, not "[d]iscrete acts such as termination, failure to promote, denial of transfer, or refusal to hire." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114 (2002); *Crum v. Advoc. N. Side Health Network*, 733 F. Ap'x 842, 843 (7th Cir. 2018) ("[T]here is no general continuing-violation doctrine in the federal law of employment discrimination.") Accordingly, the Court grants summary judgment to Defendants on Stewart's claims relating to the elimination of his position and his termination.

### b. Timeliness of Refusal to Hire Claims

Defendants argue that Stewart became aware he was not selected for the P1, P2, P3, P7, P8, and P10 positions before July 28, 2020, and, as such, his claims relating to those positions are untimely. Stewart concedes that his claims as to the P1 and P7 positions are untimely. As to the P2 position, he testified that it "sounds correct" that he was notified he did not obtain the P2 position on July 15, 2020. ECF No. 81 at 207:10–13.[1] As to the P10 position, Stewart testified he knew that he was not selected prior to July 28, 2020. *Id.* ¶ 78 (admitting that "Stewart testified to being informed he had not been selected on July 22, 2020").

However, the evidence cited by Defendants regarding notice of the P3 and P8 positions is not precise. For the P3 position, Stewart was asked if he was informed he did not receive the P3 position "on or about July 15th of 2020" to which he responded "[y]es." ECF No. 81 at 113:21–23. As to the P8 position, Stewart also responded "[y]es" when asked if he was notified that he did not receive the position "on or about July 23, 2020." *Id.* at 153:18–21. Defendants characterized this evidence as establishing that Stewart was notified he did not receive these positions on dates

---

[1] Stewart's argument that this fact is disputed relates to another position. ECF No. 149 ¶ 43 (citing a deposition answer relating to the P3 position).

A-6

certain—July 15, 2020 and July 23, 2020. ECF No. 149 ¶¶ 47, 69. However, the only evidence that supports the date of notification is this deposition testimony, which is at best ambiguous as to the exact date of notification and there is thus a genuine dispute of fact as to whether Stewart's claims as to those positions are timely.

Accordingly, the Court grants summary judgment to Defendants on timeliness grounds for Stewart's claims relating to positions P1, P2, P7, and P10, but Stewart's claims remain as to positions P3, P4, P5, P6, P8, and P9.

## II.    Refusal To Hire Claims

Defendants argue they are entitled to summary judgment on Stewart's refusal to hire claims which are not time-barred for positions P3, P4, P5, P6, P8, and P9. The ADEA makes it unlawful to "fail or refuse to hire or to discharge any individual . . . because of such individual's age" 29 USC § 623(a). An ADEA claim requires a plaintiff to prove that "but for his age, the adverse action would not have occurred." *Wrolstad*, 911 F.3d at 454. As such, "the basic question at the summary-judgment stage is whether the evidence as a whole would allow a reasonable jury to find that the plaintiff suffered an adverse job action because of his age." *Id.* Because a reasonable jury could not find that Stewart was not hired for these positions due to his age, the Court grants summary judgment to Defendants.

A reasonable jury could not conclude that Defendants failed to hire Stewart because of his age for positions P3, P4, P6, P8, or P9 because, by Stewart's own admission, the individuals that were hired for these positions were not outside of Stewart's protected class. ECF No. 157 at 6–7 (identifying only the P1, P5, P7, and P10 positions as those where Defendants "hired younger, less experienced applicants to fill the role"); *see also Barnes v. Bd. of Trs. of Univ. of Illinois*, 946 F.3d

7

A-7

384, 389 (7th Cir. 2020) ("To survive summary judgment on his failure-to-promote claim, Barnes needed evidence that . . .   someone outside the protected class who was 'not better qualified' was hired instead.") In fact, Stewart concedes that he may not proceed with failure to hire claims for these positions. ECF No. 157 at 17 (arguing that "the positions for which Stewart may claim discrimination" are P1, P5, P7, and P10). Accordingly, no reasonable jury could conclude that the Defendants did not hire Stewart because of his age and the Court grants summary judgment to Defendants as to Stewart's claims for failure to hire for positions P3, P4, P6, P8, and P9.

This leaves Stewart's claims that Defendants discriminated against him on the basis of his age by refusing to hire him for the P5 position. Stewart argues that the applicant chosen for the role, 32-year-old Anderberg, did not have superior qualifications to him because Stewart had "20 years of mostly Nissan-specific experiences" while Anderberg had only 7 years of experience and because Stewart scored higher on a candidate assessment tool. ECF No. 157 at 17–18.

However, even assuming that Stewart is correct that he is equally or more qualified, he has put forward no evidence that the decision to hire Anderberg was on the basis of Stewart's age, rather than an honest decision by the hiring manager that the applicant was preferable for the position. "An employer's genuine belief that another candidate's vision for the organization or skillset makes them better suited for the job is a legitimate, nondiscriminatory hiring rationale." *Cunningham v. Austin*, 125 F.4th 783, 789 (7th Cir. 2025). A court should not second guess an employer's decision to weigh desired traits, such as "subject matter expertise or difficult to measure intangibles." *Id.* However, a plaintiff can demonstrate that an explanation for a decision was pretextual through demonstrating that it "has no basis in fact" or through "ambiguous or suggestive comments or conduct." *Paterakos v. City of Chicago*, No. 24-1567, 2025 WL 2314843,

8

A-8

at *6 (7th Cir. Aug. 12, 2025). Stewart has not established pretext or provided any other evidence that his age was the reason he was not selected for the P5 position.

Harrison's and Ebb's decision to hire 32-year-old Anderberg had a basis in fact. Harrison testified that he made the decision to hire Anderberg in coordination with Greg Ebbs.[2] ECF No. 97 at 71:4–13. The primary reason they chose Anderberg was because he had recent experience in aftersales experience, which was relevant to the role, and that experience outweighed Stewart's two-years of aftersales experience from approximately 20 years prior. *Id.* at 53:22–24, 56:19–21, 57:4–8, 60:3–5, 71:21–72:5, 76:24–77:1. The Court finds that this explanation is based in fact, and is not in the position to weigh the relative value of scores on assessments and experience with Defendants against more recent and extensive relevant job experience. *Cunningham*, 125 F.4th at 789.

Stewart has presented no other evidence, such as evidence of pretext, that could lead a reasonable jury to conclude he was not offered the P5 position because of his age. To be sure, Stewart points to certain comments and actions taken by various employees of the Defendants that could be considered suggestive or indicate a distaste for older workers generally, largely relating to motives for the reorganization. *See, e.g.*, ECF No. 169 ¶¶ 27–45. However, even assuming that these statements and documents are admissible, none come from Harrison or Ebbs, or relate to hiring for the P5 position. *Serir v. Cmty. Coll. Dist. No. 514*, No. 21-2696, 2022 WL 807864, at *3 (7th Cir. Mar. 16, 2022) (holding that comments by an individual who had no role in a specific application could not permit "a reasonable jury to conclude" an employer denied a plaintiff's "application because of his age."); *Joll v. Valparaiso Cmty. Sch.*, 953 F.3d 923, 935 (7th Cir. 2020)

---

[2] To the extent Stewart attempts to argue that this position was filled at the direction of someone other than Ebbs and Harrison, he has provided no evidence for that argument.

("A remark or action *by a decision-maker* reflecting unlawful animus may be evidence of his or her attitudes more generally." (emphasis added)); *Hasan v. Foley & Lardner, LLP*, 552 F.3d 520, 528 (7th Cir. 2008) ("[D]erogatory remarks are relevant if they are made by someone who provided input into the adverse employment decision.").

Accordingly, because Harrison and Ebbs had "nondiscriminatory reasons for preferring" Anderberg, "[n]o evidence suggests that these reasons were pretextual," and no other evidence suggests that the decision was on the basis of Stewart's age, the Court must grant summary judgment to Defendants on Stewarts remaining claim for refusal to hire for the P5 position. *Wrolstad*, 911 F.3d at 455–56.

### III.    Retaliation Claims

In addition, Defendants have moved for summary judgment on Stewart's claims that he was not hired for positions P3, P4, P5, P6, P8, and P9 because of complaints he made concerning age discrimination. In June and July 2020, Stewart complained to Cicchini that he believed he was being subject to age discrimination. ECF No. 150 ¶¶ 59–60. Stewart made similar complaints to Dessaw in late July and early August 2020. *Id.* ¶¶ 61, 64. Stewart did not use the internal complaint process available to him. ECF No. 169 ¶¶ 22.

"In order to demonstrate that a defendant was motivated to retaliate based on the plaintiff's protected activity, the plaintiff must first produce evidence that the defendant had actual knowledge of the protected activity. It is not sufficient that a decision-maker could have or even should have known about the employee's complaint." *Eaton v. J. H. Findorff & Son, Inc.*, 1 F.4th 508, 512–13 (7th Cir. 2021) (citations omitted). Here, Stewart has provided no evidence that Cicchini or Dessaw were involved in the hiring decisions for the at-issue positions or that they

A-10

informed the individuals who were responsible for those decisions. Absent such evidence, a reasonable jury could not conclude that Stewart was terminated because of his complaints of age discrimination, and the Court grants summary judgment to Defendants.

### IV.   Motion to Seal

Lastly, the parties dispute whether certain exhibits are properly filed under seal. For the reasons stated below, the parties' motions to seal are granted in part and denied in part.

First, the Court grants the motions to seal as to exhibits or portions of exhibits not discussed below because the Court did not rely upon them in deciding the instant motion for summary judgment. *See Vazquez-Velazquez v. Costco Wholesale Corp.*, No. 23 C 4477, 2025 WL 2532620, at *5 (N.D. Ill. Sept. 2, 2025) (granting a motion to seal where the exhibits were not relied upon in deciding the motion); *Williams v. Billington*, No. 3:22-CV-1300-MAB, 2024 WL 492110, at *2 (S.D. Ill. Feb. 8, 2024) (similar and collecting cases).

However, the Court concludes that certain information should not remain under seal because it was relied upon and neither implicates third-party confidentiality interests nor would jeopardize Defendants' competitive position. For instance, Exhibit B at 18:23–21:17 and Exhibit C at 204:22–211:24 concern Stewart's complaints of age discrimination or the general process for which such a complaint should be handled. Defendants shall refile these exhibits with this information unredacted. And while Exhibit C at 214:1–223:16 contains certain third-party information, that information can be redacted while allowing the public to see information relevant to the resolution of this dispute concerning Defendants' hiring practices generally and the history of hiring for the roles for which Stewart was not selected, which the Court does not believe will jeopardize Defendants' competitive position. Defendants shall refile this exhibit with minimal

A-11

redactions to the extent necessary to protect the identity of third parties. Further, Ledieu 30(b)(6) Deposition Exhibit 18, Ledieu Depostion Exhibit 40, and Dessaw Deposition Exhibit 11 consist of proposed separation agreements for Stewart that do not identify any third party with specificity and which the Court does not believe could realistically harm Defendants' competitive position. Defendants shall file public versions of these documents without redactions.

Lastly, Exhibit S consists of an EEOC Position Statement relevant to this litigation. This document shall be filed publicly by Defendants, as they concede it can be obtained via a Freedom of Information Act request. ECF No. 175 at 3, n.1.

### Conclusion

For the reasons discussed above, Defendants' motion for summary judgment [70] is granted and the parties' motions to seal [104] [116] [158] [164] [170] are granted in part and denied in part. All other pending motions are terminated. Civil case terminated.

**SO ORDERED.**                                    **ENTERED: September 19, 2025**

_____

**HON. JORGE ALONSO**

**United States District Judge**

A-12

ILND 450 (Rev. 04/29/2016) Judgment in a Civil Action

# IN THE UNITED STATES DISTRICT COURT
## FOR THE
## NORTHERN DISTRICT OF ILLINOIS

Matthew Lee Stewart,

Plaintiff(s),

v.

Nissan North America, Inc. et al,

Defendant(s).

Case No. 22 C 4734
Judge Jorge L. Alonso

## JUDGMENT IN A CIVIL CASE

Judgment is hereby entered (check appropriate box):

☐    in favor of plaintiff(s)
and against defendant(s)
in the amount of $

     which ☐ includes    pre–judgment interest.
          ☐ does not include pre–judgment interest.

Post-judgment interest accrues on that amount at the rate provided by law from the date of this judgment.

Plaintiff(s) shall recover costs from defendant(s).

☑    in favor of defendant(s) Nissan North America, Inc., Nissan Motor Acceptance Corporation
and against plaintiff(s) Matthew Stewart

Defendant(s) shall recover costs from plaintiff(s).

☐    other:

This action was (check one):

☐ tried by a jury with Judge                 presiding, and the jury has rendered a verdict.
☐ tried by Judge        without a jury and the above decision was reached.
☑ decided by Judge Jorge L. Alonso       on a motion.

Date: 9/19/2025

Lesley Fairley        , Deputy Clerk

A-13